UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERNARDO VILLA ARAUJO,<br><br>  Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>  Defendant. | Case No. 13-CV-2418-WQH (JMA)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 11] AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. NO. 12]** |

Plaintiff Bernardo Villa Araujo ("Plaintiff") seeks judicial review of Defendant Social Security Commissioner Carolyn W. Colvin's ("Defendant") determination that he is not entitled to disability insurance benefits ("DIB") and supplemental security income ("SSI"). The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED**.

## I. BACKGROUND

Plaintiff, a resident of Brawley, California, was born in 1959. (Admin.

R. at 25, 98.)  He completed twelfth grade and previously worked as a driver in the agricultural field and a driver/mechanic in the cattle business. (Id. at 134.)  In applications for DIB and SSI filed in December 2011 and October 2012, respectively, Plaintiff alleged a disability onset date of February 11, 2011 due to problems with his left leg and hands.  (Id. at 98-101, 108-17, 129-38.)  Plaintiff's application for DIB was denied initially on April 12, 2012 and upon reconsideration on September 28, 2012.  (Id. at 62-66.)  On October 11, 2012, Plaintiff requested an administrative hearing. (Id. at 67-68.)  A hearing was conducted in Tucson, Arizona on April 11, 2013 by Administrative Law Judge ("ALJ") Laura Speck Havens, who determined on May 8, 2013 that Plaintiff was not disabled.  (Id. at 14-19.) Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on August 8, 2013.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II. MEDICAL EVIDENCE

**A.   Steven Tradonsky, M.D. - Worker's Compensation Doctor**

Dr. Steven Tradonsky conducted an orthopaedic reevaluation of Plaintiff on May 5, 2011.  (Id. at 190-99.)  Dr. Tradonsky noted in his report that he had treated Plaintiff between December 2007 and November 2009 for an injury Plaintiff sustained at work on November 19, 2007 when he slipped while refueling a truck and twisted his left knee.  (Id. at 190.)  At that time, Plaintiff was diagnosed with multi-ligament injuries in the knee and a peroneal nerve palsy with foot drop.  (Id.)[1]  Plaintiff underwent

---

[1] Foot drop is a general term for difficulty lifting the front part of the foot.  A person with foot drop may drag the front of their foot on the ground when they walk.  See http://www.mayoclinic.org/diseases-conditions/foot-drop/basics/definition/con-20

1 multiple reconstructive surgeries and was released to his work duties
2 without restrictions in or around August 2009.  (Id.)  Plaintiff performed his
3 work duties until February 2011 when he was laid off.  (Id.)

4      Plaintiff presented to Dr. Tradonsky on May 5, 2011 with complaints
5 of increasing symptoms in his leg.  (Id.)  He reported that he had mild
6 ongoing pain in his knee on a daily basis, as well as intermittent sharp pain.
7 (Id. at 191.)  His primary difficulty was with walking, as he continued to
8 have a partial foot drop on his left side if he walked more than a quarter of
9 a mile.  (Id.)  As a result, he had fallen on multiple occasions.  (Id.)  He also
10 complained of occasional pain radiating up toward his hip and into his low
11 back because of his altered gait secondary to his foot drop.  (Id.)

12      Dr. Tradonsky determined that Plaintiff's symptoms were related to
13 the work injury he sustained on November 19, 2007, and opined that
14 Plaintiff could perform his regular work duties without restrictions.  (Id. at
15 192.)  Dr. Tradonsky recommended that Plaintiff be seen by an orthotist for
16 evaluation for a spring-loaded foot drop splint to assist him with his
17 abnormal gait.  (Id. at 193.)

18 **B.  Mervat G. Kelada, M.D. - Examining Physician**

19      Plaintiff received a general medical examination from Dr. Mervat
20 Kelada on July 11, 2011.  (Id. at 174-78.)  Dr. Kelada noted that Plaintiff
21 walked with a brace and a mild limp, and had been unemployed since
22 February 2011, when he was laid off due to the economy.  (Id. at 174-75.)
23 She also noted that Plaintiff had been told he had hypertension years ago,
24 but had not been taking any medication for his blood pressure.  (Id.)  Dr.
25 Kelada opined that Plaintiff had a mild disability, but with his driver's license
26 could still work as a driver.  (Id. at 175.)
27 //
28

---

032918 (as visited Nov. 5, 2014).

### C.  Thomas A. Schweller, M.D. - Examining Physician

Plaintiff underwent a neurological consultation with Dr. Thomas Schweller on March 28, 2012 at the request of the Department of Social Services. (Id. at 179-81.) Plaintiff recounted the history of his left knee injury and foot drop, and also advised that he began to have numbness in his hands in 2007 but had never been evaluated for it. (Id. at 179.) He had been wearing self-prescribed braces on his wrists during his sleep for the past two years. (Id.) Dr. Schweller's diagnoses consisted of status post left peroneal nerve injury at the knee, bilateral median neuropathy at the wrists, and uncontrolled and untreated hypertension. (Id. at 181.) With respect to Plaintiff's functional capacity, Dr. Schweller opined that Plaintiff could sit, stand, and walk for six hours out of an eight-hour workday; could lift twenty pounds occasionally and ten pounds frequently, with occasional limits in bending, stooping, and squatting; had no kneeling or crawling limitations; and did not require an assistive device for ambulation, but should avoid unprotected heights and exposure to moving machinery. He further opined that Plaintiff's sensory neuropathy from carpal tunnel in both hands placed no limits on his gross handling, reaching, or push/pull capabilities, but he would have occasional limits in fingering of both hands. (Id.)

### D.  Mary Kay Klockmann, N.P. - Treating Nurse Practitioner

Plaintiff had an office visit with nurse practitioner Mary Kay Klockmann on September 11, 2012. (Id. at 183-88.) He reported that his carpal tunnel symptoms began a year prior and rated 7 on a pain scale of 10. (Id. at 183.) He also rated his left knee symptoms as 7 on a scale of 10. (Id.) His medications included Tramadol (pain reliever), Naproxen (nonsteroidal anti-inflammatory medicine (NSAID)), and Lisinopril (for high blood pressure). (Id.) On examination, Plaintiff's left knee showed

tenderness and a mildly reduced range of motion.  (Id. at 185.)  Plaintiff stated that his carpal tunnel had never been treated, that he was not able to hold things, and that he dropped items easily.  (Id.)  Nurse Klockmann started Plaintiff on a new prescription for his high blood pressure and advised him to follow up in 1-2 weeks.  (Id.)

**E.     Safwan Alboiny, M.D. - Treating Physician**

Plaintiff presented to Dr. Safwan Alboiny, neurologist, on January 31, 2013 with complaints of carpal tunnel.  (Id. at 200-01.)  Plaintiff stated that his symptoms of pain, numbness, and weakness started a few years prior.  (Id. at 200.)  Dr. Alboiny confirmed the diagnosis of carpal tunnel and, noting that Plaintiff did not experience pain on a daily basis, recommended an EMG and nerve conduction studies of the upper extremities, an MRI of the cervical spine, trigger point injections for carpal tunnel as needed, continued use of wrist splints, and referral to physical and occupational therapy twice per week for a month.  (Id. at 201.)

**III. THE ADMINISTRATIVE HEARING**

The ALJ conducted an administrative hearing on April 11, 2013.  (Id. at 20.)  Plaintiff, who was not represented by counsel at the hearing, testified that as of February 11, 2011, the date he alleged he became disabled, his carpal tunnel and nerves in his left leg worsened.  (Id. at 26.)  He acknowledged, however, that he had received unemployment benefits in 2012, and thus had certified to the State of California that he was able to work at that time.  (Id.)  During that period of time, he applied for truck driver and mechanic jobs monthly through Cal Jobs.  (Id.)  He testified that he probably could have worked as a truck driver, but not as a mechanic at that time.  (Id.)  By December 2012, "it just got real bad" and he was no longer able to work at all, even as a truck driver.  (Id. at 26-27.)

Plaintiff testified he sometimes needs help putting his clothes on and scrubbing his back, and is not able to do any household chores. (Id. at 27-28.) He received his last worker's compensation check in 2011. (Id. at 29.) He does not have any hobbies, and watches TV for four to five hours per day. (Id.) He has a driver's license, but the longest drive he can make is to Wal-Mart, about a mile away. (Id.) He has problems sleeping. (Id.) Plaintiff testified that his primary doctor is Dr. Alboiny, whom he generally sees about once per month. (Id. at 30.) He takes high blood pressure medication, aspirin, cholesterol pills, and two painkillers, Tramadol and Naproxen. (Id.)

He stated that he can only walk or stand for five minutes at a time because of the nerve in his left leg. (Id. at 31.) He can sit for an hour before needing to get up. (Id.) He does not do any lifting. (Id.) He experiences pain in the back of his left leg up his spine to his back and neck, and in both hands, with the pain being worse on the left because he is left-handed. (Id.) He has pain around the wrist area, and is not able to pick things up with his fingers without dropping them. (Id. at 31-32.) He can pick up a Styrofoam cup, but not a coffee cup or a book. (Id. at 32.) He is not able to move his fingers on a keyboard. (Id.) He rated his pain as an 8 or 9 on a scale of 10; it reduces to 5 when he takes medication. (Id.) He had received a "shock treatment" from Dr. Alboiny a few weeks before, and was going to try "needles" as used by "the Chinese" in his knee. (Id. at 33-34.)

## IV. THE ALJ DECISION

After considering the record, ALJ Havens made the following findings:

. . . .

> 2. The claimant has not engaged in substantial gainful activity since February 11, 2011, the alleged onset date [citations omitted].
>
> 3. The claimant has the following severe impairments: carpal tunnel syndrome, bilateral; high blood pressure; and residuals of a left leg injury [citations omitted].
>
> 4. The claimant does not have an impairment or combination thereof that meets or medically equals the severity of one of the listed impairments in [the Social Security regulations].
>
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b) except as limited by the ability to sit, stand, or walk for about six hours each in an 8-hour workday; frequently able to climb ramps/stairs, balance, kneel, crouch, and crawl; occasionally able to stoop or climb ladders, ropes, and scaffolding; no limitations in feeling and gross manipulation activities; occasionally able to perform fingering (fine manipulation) activities, bilaterally; and the need to avoid concentrated exposure to hazards.
>
> . . . .
>
> 6. The claimant is unable to perform any past relevant work [citations omitted].
>
> . . . .
>
> 10. Considering his age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citations omitted].
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from February 11, 2011, through the date of this decision [citations omitted].

(Id. at 16-19.)

## V. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months

or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.   Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

## B.   Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow

unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Vasquez, 572 F.3d at 591 (citation and quotations omitted).

     Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

## VI. DISCUSSION

     Plaintiff does not challenge the ALJ's findings at steps one through four of the sequential evaluation of impairments.  He contends the ALJ erred in her determination at step five by failing to consult a vocational

9

expert to evaluate the effects of his nonexertional impairments on his ability to perform the full range of light work. (Pl.'s Mem. at 10-13.) He argues the ALJ improperly relied on the "grids" to find there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, in that a limitation to only occasional fine manipulation is a significant nonexertional limitation not contemplated by the grids. In other words, he contends the ALJ improperly reached her own conclusion that a limitation to occasional fingering, or fine manipulation, has only a minimal impact on the remaining occupational base. (Id. at 11-12.)

At step five, the ALJ may obtain the testimony of a vocational expert or may refer to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2 (commonly referred to as "the grids") to meet the burden of showing there is other work in significant numbers in the national economy the claimant can perform. Tackett, 180 F.3d at 1100-01. "The grids are matrices of the 'four factors identified by Congress–physical ability, age, education, and work experience–and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.'" Lockwood v. Commissioner, 616 F.3d 1068, 1071 (9th Cir. 2010). The grids direct a finding of either "disabled" or "non-disabled." Tackett, 180 F.3d at 1101. Use of the grids at step five is justified so long as they *completely and accurately* represent a claimant's limitations. Id. (emphasis in original). Significant nonexertional impairments may make reliance on the grids inappropriate. Desrosiers, 846 F.2d at 577.[2] The fact that a nonexertional limitation is alleged,

---

[2] "Exertional capacity" relates to an individual's physical strength and ability to perform the following seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. See Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *5. "Nonexertional capacity" relates to the limitations and restrictions not reflected in the seven strength demands, and concerns an individual's postural (e.g., stooping, climbing), manipulative (e.g.,

however, does not automatically preclude application of the grids. Id. The ALJ must first determine if the nonexertional limitations significantly limit the range of work permitted by a claimant's exertional limitations. Id. Only if a nonexertional impairment is sufficiently severe that it limits the claimant's functional capacity in ways not contemplated by the grids would use of the grids be inappropriate. Id.; see also Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), *overruled on other grounds by* Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991).

Here, in determining that Plaintiff was not disabled, the ALJ relied on Medical-Vocational Rule 202.14, which corresponds to a person with the residual functional capacity to perform light work (lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds), closely approaching advanced age (persons age 50-54), high school graduate or more, and skilled or semiskilled with skills not transferable, which directs a finding of "not disabled." See 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.14; 20 C.F.R. § 404.1563(d) (defining age as vocational factor); id. at § 404.1567(b) (defining light work). When a claimant, such as Plaintiff, has impairments that result in both strength limitations and nonexertional limitations, the grids "provide a framework for consideration of how much the individual's work capacity is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." See 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2). After it has been decided that an impaired person can meet the primary strength requirements of sedentary, light, or medium work, a further decision may be required as to how much of this potential

---

reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) abilities, as well as the individual's ability to tolerate various environmental factors. Id. at *6.

occupational base remains, considering the nonexertional limitations a claimant has. SSR 83-14, 1983 WL 31254, at *2. "A particular . . . nonexertional limitation may have very little effect on the range of work remaining that an individual can perform." Id. at *3.

Plaintiff contends the ALJ erred by failing to consult with a vocational expert regarding the effect of his limitation to occasional fingering on the occupational base for light work. "'Fingering' involves picking, pinching, or otherwise working primarily with the fingers." SSR 85-15, 1985 WL 56857, at *7. "It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion." Id. However, "many unskilled light jobs do not entail fine use of the fingers." SSR 83-14, at *4. "Rather, they require gross use of the hands to grasp, hold, and turn objects." Id.; see also SSR 83-10, 1983 WL 31251, at *6 ("Many unskilled light jobs . . . require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.").

As the above rulings demonstrate, there is a wide range of light work requiring grasping, holding, and turning, all of which the ALJ found Plaintiff could perform, and which Plaintiff does not contest. Although Plaintiff can only perform occasional fingering, light work does not require this type of activity to the extent that most sedentary work does. When it is very clear that an additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the grids is not affected. SSR 83-14, at *6. Only if the adjudicator does not have a clear understanding of the effects of additional limitations on the job base are the services of a vocational specialist or expert necessary. Id. That was not the case here. The Court accordingly finds the ALJ's use of the grids to make a finding of not disabled was appropriate under these circumstances.

## VII.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment should be **DENIED** and Defendant's cross-motion for summary judgment should be **GRANTED**.

This report and recommendation will be submitted to the Honorable William Q. Hayes, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **December 5, 2014**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **December 15, 2014**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 14, 2014

Jan M. Adler
U.S. Magistrate Judge